1  MICHAEL A. SWEET (SBN 184345)
   msweet@foxrothschild.com
2  DALE L. BRATTON (SBN 124328)
   dbratton @foxrothschild.com
3  FOX ROTHSCHILD LLP
   235 Pine Street, Suite 1500
4  San Francisco, CA 94104-2734
   Telephone:   415.364.5540
5  Facsimile:    415.391.4436

6  Attorneys for Trustee
   E. LYNN SCHOENMANN
7

8                  UNITED STATES BANKRUPTCY COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11

12 In Re:                              Bk. No.: 11-33792-HLB

13     FRANK EDWARD LEMBI,             Chapter 7

14          Debtor.                    **TRUSTEE'S MOTION FOR ORDER
                                       APPROVING SALE PROCEDURES
15                                     FOR SPECIFIED PROPERTY OF
                                       THE ESTATE**
16

17                                     Date:      April 25, 2013
                                       Time:      10:00 a.m.
18                                     Place:     Courtroom 23
                                                  235 Pine Street, 23rd Floor
19                                                San Francisco, CA 94104

20

21 **TO:   The Honorable Hannah L. Blumenstiel, U.S. Bankruptcy Judge,
           Debtor, Debtor's Counsel, The Office Of The U.S. Trustee, And
22         Parties Who Have Requested Special Notice**

23         E. Lynn Schoenmann ("Trustee"), trustee for the bankruptcy estate ("Estate") of

24 debtor Frank Edward Lembi (the "Debtor"), hereby moves (the "Motion") for an order of

25 the Court approving procedures and a process for the sale of specified property of the

26 Estate, on which the Trustee has received an offer for purchase in a single lot on favorable

27 terms, all as described more particularly below.  The requested sale procedures ("Sale

28 Procedures") are attached hereto as Exhibit A.  The assets to be sold (the "Assets") are the

Estate's interests and claims described in Exhibit 1 to the Sale Procedures.  The offer

received for the Assets, *i.e.* the "Lead Bid," is described in Exhibit 2 to the Sale Procedures.

This Motion is supported by the Memorandum of Law, and the Declaration Of Jay

D. Crom (of Bachecki, Crom & Co., LLP, accountants employed by the Trustee with the

approval of the Court), filed concurrently.

### Relief Requested

The Estate has received an offer to purchase various entity interests and claims held

by the Estate that are related to the Debtor's business activities in the San Francisco hotel

industry.

1.  The Interests

The Estate holds non-controlling interests in several entities active in the hotel

industry in San Francisco.  One of these entities is Personality Hotels, LLC ("PH LLC").

PH LLC owns three hotels in the downtown area of San Francisco  the Hotel Union Square,

the Hotel Diva, and the Steinhart Hotel.  The Estate holds a 25% interest in PH LLC,

including the .25% it owns indirectly through PH Manager.  The right to manage PH LLC is

held by Personality Hotels Manager, LLC ("PH Manager").  The Estate holds a 50% non-

controlling interest in PH Manager (which owns a .5% interest in PH LLC).

Another of these entities is Personality Hotels, Inc. ("PH Inc.").  PH Inc. owns a

parking lot near Union Square in San Francisco.  The parking lot is master leased to a

parking operator through December 2020.  The Estate holds a 50% non-controlling

shareholder interest in Personality Holding Company, Inc., which is the sole shareholder of

PH Inc.  Notably, PH Inc. holds a building permit to erect a hotel on the site of the parking

lot, permitted for approximately 11 stories and/or 156 rooms.  This permit has a near-term

expiration date, but an extension application has been filed.

The Estate also owns the Debtor's personal residence, located in Burlingame,

California (the "Debtor's Residence").  The Estate has previously been authorized to sell the

Debtor's Residence.  As will become clear, this asset is relevant to the present Motion.

2

The various Personality Hotel entities are owned, as was typical of the Debtor's prepetition business activities, by various combinations of his family members or trusts for their benefit. In a major example, a trust established in the name of the Debtor's deceased spouse, Olga Lembi (passed away in 1996) – commonly known as the "Olga Trust" – has significant interests in the various Personality Hotel entities.

One of the Debtor's daughters, Yvonne Lembi-Detert ("YLD"), is very active in the hotel entities. She holds a 25% interest in PH LLC. Further, a management company that she owns and controls – Engage Hospitality, LLC ("Engage") – has entered into long-term agreements to manage and operate the hotels owned by PH LLC (the "Engage Contracts").

YLD also desires to assist her father – who is (a very spry) 94 years old – to remain in the Debtor's Residence, his long-time home. The Estate is not unsympathetic to this desire, though the Estate naturally must obtain the economic value of the Residence. Also relevant is that there is a reverse first mortgage on the Residence, which cannot be assumed by a third party under the regulations governing reverse mortgages and which would have to be paid off if the Residence were sold to a third party.

2.  The Claims

The Estate also has claims against YLD and Engage related to the Personality Hotels entities.

In 2009 the Debtor purportedly transferred a 25% interest in PH LLC to YLD, for asserted good and valuable consideration (the "2009 PH Transfer"). The Estate contends that there was either no consideration for this intra-family transfer, or that the purported consideration was not at all reasonably equivalent to the economic value of this 25% interest in an entity owning three downtown San Francisco hotels. The Estate therefore contends that the 2009 PH Transfer should be avoided as a fraudulent transfer within the meaning of applicable bankruptcy and state law, and that 25% interest in PH LLC deemed to be Estate property, so that the Estate's total interest in PH LLC would amount to 50%.

The Estate also contends that the Engage Contracts are subject to challenge in two

3

respects. In the first place, these hotel management contracts entered into between Engage (owned and controlled by YLD) and PH Manager (which was at the time of contracting 100% controlled by her father, the Debtor, in his own right and as trustee of the Olga Trust) provide for management fees that are grossly out of line with market rates for such services in the San Francisco hotel industry. In the second place, these contracts are for ten-year initial terms with two automatic consecutive ten-year extension options (with the last extension option running through December 2040). This is extraordinarily long for hotel management agreements. Their highly unusual duration, when coupled with their over-market fees, has the effect of substantially depressing the value and marketability of the hotels, and thus the Estate's partial interest in the entity that owns them. Accordingly, the Estate contends that entry into the Engage Contracts should be avoided as a fraudulent transfer within the meaning of applicable bankruptcy and state law.

YLD and Engage dispute all of the Estate's claims concerning YLD's interests in PH LLC, and the propriety of the Engage Contracts (collectively, the "Claims"). While there has been discussion among the parties concerning these claims, there has been no litigation commenced by the Estate with respect to them, and their merits and value have not been definitively determined.

The Estate also has a claim against YLD for payment of a promissory note in the amount of $635,000 (the "$635K Note). The $635K Note is not related to the Personality Hotels entities, and, as indicated below, in the current proposed sale transaction the Estate would retain its claim for payment of the $635K Note.

3. The Transaction

The Estate welcomes an opportunity to sell its non-controlling, illiquid positions in the Personality Hotels entities. It would be either impossible or very difficult for the Estate to compel a sale of the underlying assets outright, and other members or shareholders in the Personality Hotels entities do not desire that the underlying assets be sold. Therefore a sale of the Estate's non-controlling interests in the entities represents the Estate's best liquidity

4

alternative. The Estate is also willing to liquidate for value the Claims.

YLD wishes to acquire the Estate's non-controlling positions in the Personality Hotels entities. She also wishes to acquire the Estate's asserted Claims. Inclusion of the sale of the Debtor's Residence back to the Debtor, at YLD's expense, so that he may remain in his home, is also a condition of YLD's offer. This condition is acceptable to the Trustee, because the economics of this component are sound.

YLD's offer is thus made only for a combined transaction, which includes the Interests (including a quitclaim of the Estate's interest in the Debtor's Residence to him) and disposition of the Claims. Such a combined transaction is attractive to the Estate, because it liquidates otherwise passive, illiquid non-controlling entity interests, and monetizes the disputed Claims without the expense and delay of litigation. Under YLD's offer, the Estate also does not have to pay the Debtor a homestead exemption of $175,000 in connection with a sale of his Residence, and the approximately $540,000 existing reverse first mortgage on the Debtor's Residence would remain in place.

To make possible a transaction that would accomplish these mutual goals, YLD has obtained a financing commitment from AGPM Bridge 11 Holdings LLC (or an affiliate), a general unsecured creditor of the Estate ("AGPM") holding a $47,043,311 guarantee claim against the Debtor stemming from an unrelated prepetition debt transaction. With this financing commitment in hand, YLD is able to offer the Estate the following, for the purchase of the Interests and the Claims:

(a) $7,780,000 in cash (including a deposit of $280,000 already in hand); and

(b) a release by AGPM of its general unsecured claim against the Estate, in the amount of $47,043,311; a release which the Trustee values as the equivalent of $1,800,000 in cash (in an estimate from the circumstances of this case made only for the purposes of this transaction, not binding for any other purpose);

resulting in aggregate consideration for the Interests and the Claims of $9,580,000. YLD's offer to enter into this transaction is considered the Lead Bid and she the "Lead

5

Bidder." There are conditions to the Lead Bid, which are generally described in Exhibit 1 to Exhibit A hereto. The most significant of them relates to a first mortgage securitized CMBS loan secured by the hotel properties owned by PH LLC. Absent the prior consent of the senior lender on the hotel properties, a sale of the Estate's interest in PH Manager causes an event of default under the loan that would trigger a very substantial early defeasance penalty. The loan is fully assumable by qualified borrowers but the securitized nature of the loan and the fact that FEL is a guarantor of the loan may require significant time and effort to obtain the consent. That consent has not as of this date been obtained, it is an absolute condition to the closing of the transaction contemplated by the Lead Bid, and it is a condition that potentially may not be satisfied resulting in the sale not closing. The senior lender's loan documents call for a loan assumption fee equal to approximately $250,000, of which the Trustee will be liable for one-half, not to exceed $125,000, with the remainder of any fees or additional lender consent costs borne by YLD.

The financing commitment afforded to YLD to make the Lead bid involves agreements between her and AGPM for repayment of the financing, concurrently with closing of the sale transaction. As a result of those agreements, AGPM will obtain controlling interests in the resulting restructured ownership entities; YLD will retain minority interests in those entities. This result is acceptable to YLD, and it does not concern the Estate because the Estate is cashed out of its interests for attractive aggregate consideration.

A fuller description of the Lead Bid is provided in Exhibit 1 to Exhibit A hereto.

4. The Sale Process and Bidding Procedures

The Trustee proposes to treat the Lead Bid as an opening bid for the Assets (the Interests and the Claims together), and to seek other financially qualified bidders who may potentially be interested in acquiring the Assets.

A competing bidder would be required to demonstrate financial capacity to complete a transaction in the amount of the sale price, without financing or other contingency. A

6

competing bidder would be required to make a cash deposit equal to 10% of the cash portion of the Lead Bid, *i.e.*, $778,000. This amount is greater than the deposit made by the Lead Bidder because the Lead Bidder has invested a very substantial amount of time and expense in formulating, investigating, and negotiating the terms of the Lead Bid. The limitations on refundability of a competing bidder's deposit if the competing bidder were to become the high bidder are specified in the Sale Procedures; they are of a customary nature. If a competing bidder were to become the high bidder, the Lead Bidder would be entitled to a break-up fee of $250,000, which is well within the range accepted as reasonable in bankruptcy case law for bankruptcy sale transactions.

A fuller description of the detailed Sale Procedures for which approval is being sought is provided in Exhibit A hereto.

The Assets are quite particular in nature. They involve non-controlling interests in entities that manage and operate otherwise valuable underlying assets, but as to which the other members and shareholders in the entities do not desire a sale of the underlying assets. They involve disputed litigation claims against YLD and Engage. Therefore, while the Trustee will as a matter of good business practice expose these assets to the market and hopes that active interest results, she notes that it is not necessarily realistic to expect that interested and qualified bidders will appear. She seeks an order via this Motion setting the framework for active bidding in case there is active market interest.

7

1     WHEREFORE, the Trustee requests entry of an order (i) approving the Sale

2  Procedures, (ii) setting dates for ascertaining interested and qualified bidders on the Assets,

3  (iii) holding an auction (if necessary) among competing qualified bidders, (iv) setting a date

4  for a hearing on a sale of the Assets to a winning bidder, and (v) such other and further

5  relief as the Court deems just and proper.

6      DATED:  April 15, 2013                FOX ROTHSCHILD LLP

7

8                                            By:___*Dale L. Bratton*_____
                                                    Dale L. Bratton
9
                                             Attorneys for
10                                           E. Lynn Schoenmann, Trustee

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                             8